## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD J. SILVERBERG | : | |
| -and- | : | |
| ELS REALCO LLC | : | |
| | : | |
| Plaintiffs | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA | : | NO. |
| -and- | : | |
| WILLIAM PENN FOUNDATION | : | |
| -and- | : | |
| JANET HAAS, M.D. | : | |
| -and- | : | |
| JAMES KENNEY | : | |
| -and- | : | |
| TUMAR ALEXANDAR | : | |
| -and- | : | |
| FRANK BRESLIN | : | |
| -and- | : | |
| MARCEL S. PRATT, ESQUIRE | : | |
| -and- | : | |
| DIANA P. CORTES, ESQUIRE | : | |
| -and- | : | |
| MARISSA O'CONNELL, ESQUIRE | : | |
| -and- | : | |
| BRIAN R. CULLIN, ESQUIRE | : | |
| -and- | : | |
| KELLY DIFFILY, ESQUIRE | : | |
| -and- | : | |
| JOHN DOE NOS. 1-15 | : | |
| | : | |
| Defendants | : | |

## CIVIL ACTION

## Preliminary Statement

"I never said most of the things I said."

Yogi Berra

## PARTIES

1.      Plaintiff, Richard J. Silverberg, is an individual with a principal address in Philadelphia, Pennsylvania.

2.      Plaintiff, ELS Realco LLC (hereinafter "ELS"), is a Delaware limited liability company with a principal address in Dover, DE.

3.      Defendant, City of Philadelphia (hereinafter "City"), is a municipal corporation with a principal place of business in Philadelphia, Pennsylvania.

4.      Defendant, William Penn Foundation (hereinafter "William Penn" or the "Foundation"), is a private nonprofit charitable organization with a principal place of business in Philadelphia, Pennsylvania.

5.      Defendant, Janet Haas, M.D, is an individual with a principal address in Philadelphia, Pennsylvania.

6.      Defendant, James Kenney, is an individual with a principal address in Philadelphia, Pennsylvania.

7.      Defendant, Tumar Alexander, is an individual with a principal address in Philadelphia, Pennsylvania.

8.     Defendant, Frank Breslin, is an individual with a principal address in Philadelphia, Pennsylvania.

9.     Defendant, Marcel S. Pratt, Esquire, is an individual with a principal address in Philadelphia, Pennsylvania.

10.     Defendant, Diana P. Cortes, Esquire, is an individual with a principal address in Philadelphia, Pennsylvania.

11.     Defendant, Marissa O'Connell, Esquire, is an individual with a principal address in Philadelphia, Pennsylvania.

12.     Defendant, Brian R. Cullin, Esquire, is an individual with a principal address in Philadelphia, Pennsylvania.

13.     Defendant, Kelly Diffily, Esquire, is an individual with a principal address in Philadelphia, Pennsylvania.[1]

14.     Defendants, John Doe Nos. 1-10, are officers, directors, executives, managers, administrators, attorneys, and other agents, officials, representatives, and employees of the City of Philadelphia and the William Penn Foundation.

15.     At all times relevant and material hereto, unless otherwise stated, plaintiff Silverberg was a licensed attorney, the former sole principal at Richard J. Silverberg & Associates, P.C., a law firm, and a member of ELS.

---

[1] For purposes of the instant Complaint, unless otherwise stated, refence to the "City Defendants" is to Defendants City, Kenney, Alexander, Breslin, Pratt, Cortes, O'Connell, Cullin, and Diffily.

16.     At all times relevant and material hereto, plaintiff ELS was a Delaware multi-member limited liability company.

17.     At all times relevant and material hereto, defendant City was the relevant municipal authority empowered to impose and collect certain business and individual taxes.

18.     At all times relevant and material hereto, defendant William Penn was a private nonprofit foundation.

19.     At all times relevant and material hereto, defendant Haas was Board Chair of William Penn.

20.     At all times relevant and material hereto, defendant Kenney was Mayor of the City of Philadelphia and the City's highest-ranking policymaking official.

21.     At all times relevant and material hereto, unless otherwise stated, defendant Alexander was Managing Director of the City of Philadelphia and had management and/or supervisory responsibility for the City's operating departments, including the Law Department.

22.     At all times relevant and material hereto, defendant Breslin was Revenue Commissioner - Chief Collections Officer for the City of Philadelphia and the highest-ranking policymaking official in the City's Department of Revenue.

23.     At all times relevant and material hereto, defendant Pratt was City Solicitor for the City of Philadelphia and the City's highest-ranking policymaking official in the City's Law Department, and had ultimate supervisory authority for all City of Philadelphia legal matters.

24.     At all times relevant and material hereto, defendant Cortes was Chair, Litigation Group, for the City's Law Department and had oversight and supervisory responsibility in connection with the underlying state court matters.

25.     At all times relevant and material hereto, defendant O'Connell was Divisional Deputy City Solicitor, Tax and Revenue Unit, for the City's Law Department and had oversight and supervisory responsibility in connection with the underlying state court matters.

26.     At all times relevant and material hereto, defendant Cullin was a Deputy City Solicitor, Tax and Revenue Unit, for the City's Law Department and had direct responsibility in connection with the underlying state court matters.

27.     At all times relevant and material hereto, defendant Diffily was a Senior Attorney, Appeals Unit, for the City's Law Department and had direct responsibility in connection with the underlying state court matters.

28.     At all times relevant and material hereto, the individual defendants acted within the course and scope of their employment and in furtherance of their respective employers' business and interests.  Alternatively, the individual defendants acted solely in their individual capacities.  To the extent that an agency relationship existed or may have existed between any of the entities or persons identified herein, or it is determined that an agency relationship existed, the entities/persons acted outside the scope of and/or exceeded said agency.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 in that plaintiffs have

brought the instant civil action pursuant to, *inter alia*, the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. § 1961 et seq. and 42 U.S.C. § 1983.  This Court exercises

supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

30.     Venue properly lies in the United States District Court for the Eastern District of

Pennsylvania since the alleged violations of plaintiffs' federal and state law rights occurred

within the geographical boundaries of the Eastern District of Pennsylvania.

## FACTUAL ALLEGATIONS

31.     On or about March 11, 2008, the City filed a Complaint against plaintiff

Silverberg's former law firm and plaintiff Silverberg individually alleging that, for certain

discrete periods between 1992-2004, business privilege and wage taxes were due and owing.

32.     On or about June 3, 2008, plaintiff Silverberg's former law firm and plaintiff

Silverberg having not contested the claims, a default judgment was entered against them.

33.     On or about September 25, 2008, a Praecipe for Writ of Attachment against

Commerce Bank and Wachovia Bank, the former law firm's banks, was filed and service was

promptly effectuated by the Sheriff.

34.     On or about October 20, 2008, Interrogatories in Attachment to Garnishee TD

Bank NA, the successor to Commerce Bank, were filed.

35.     On or about October 22 and November 8, 2008, the City discontinued/dissolved the Writs of Attachment against Commerce and Wachovia Banks respectively, and abandoned the claims and June 2008 judgment.

36.     From on or about November 8, 2008 to on or about June 15, 2017, or nearly nine years, the City took no further action to execute upon or enforce the June 2008 judgment, or otherwise to collect the funds that were the subject of its March 2008 Complaint.[2]

**The Beverage Tax**

37.     In or around February 2016, newly-elected Mayor James Kenney proposed a 3-cent-per-ounce tax on sweetened beverages (the "soda tax" or "Beverage Tax").

38.     The soda tax was a "signature" initiative of the Kenney Administration that was projected to raise approximately $400 million over five (5) years for purposes funding universal pre-K, community schools, jobs, recreational infrastructure, and development projects.

39.     From the outset, the proposed tax was both praised and subject to withering criticism, as well as legal challenges.

40.     The beverage industry was a major critic of the proposed tax, which included Harold Honickman, a Philadelphia-based businessman and philanthropist and one of the largest independent soft drink bottlers in the United States.

41.     Honickman stated, "It's a tax against the poor.  It's a regressive tax.  The only people you're hurting on this tax are the poor people of Philadelphia, the people who make a

---

[2] In June 2013 and May 2018, the City filed a pro forma Suggestion of Non-Payment.

living off running a little bodega." Honickman also contended the tax would be detrimental to the beverage industry.

42.     In or around April 2016, David L. Cohen, former Executive Vice President of Comcast Corporation and former Chief of Staff to former Mayor Ed Rendell, stated "There has to be a better way for us to try and figure out how to raise revenue for critically important initiatives" than to put Harold Honickman "in the crosshairs."

43.     In or around April/May 2016, the proposed soda tax gained national attention and was a topic of discussion during 2016 Presidential campaign with Bernie Sanders characterizing it as "regressive" and Hillary Clinton supporting it.

44.     On or about June 16, 2016, following negotiations between the Mayor and City Council, a compromise was reached whereby City Council approved a reduced 1.5 cents-per-ounce tax on soda and other sweetened beverages.

45.     According to published reports, the 13-4 vote ended "months of speculation and at-times bitter negotiations" concerning passage of the measure, but also "ensured that the national spotlight [would] stay turned on Philadelphia for months, if not years."

46.     Following the vote, Mayor Kenney, who counted the soda tax as the first major political victory of his term, called it a start to "changing the narrative of poverty in our city."

47.     According to The Philadelphia Inquirer, Kenney's success in obtaining the votes for the soda tax was based upon his approach:

> He tied the tax not to the health benefits it would reap by reducing
> Philadelphians' sugar intake, but to the programs it would pay for -
> expansion of prekindergarten, creation of community schools, and

8

improvements to parks, recreation centers, and libraries.

48.     At the time of the June 2016 vote, the tax was projected to raise $91 million annually.

49.     In or around October 2016, the City announced pre-K providers and opened enrollment for seats funded by the Beverage Tax.

50.     On or about December 19, 2016, the Philadelphia Court of Common Pleas dismissed a lawsuit challenging the Beverage Tax, which cleared the way for implementation. Following the decision, former Governor Ed Rendell stated, "No one will go down in the city's history as doing more for education than Mayor Kenney."

51.     In or around January 2017, the Beverage Tax took effect.

**Rebuild - Part 1**

52.     In or around March 2016, shortly after announcing the Beverage Tax, Mayor Kenney announced his intention to create a new initiative known as "Rebuild" to restore and upgrade the City's civic infrastructure - its parks, playgrounds, recreation centers, and libraries.

53.     Rebuild is a $500 million public/private sector initiative which has been described as a "pillar of [Mayor] Kenney's anti-poverty agenda" as well as a path to finally diversifying the City's building trades.

54.     According to the Fairmount Park Conservancy, the initiative represented "an unprecedented opportunity to expand access to high-quality public spaces and civic assets to all

neighborhoods of the city and to spark a new era of resident engagement, public involvement, and community building."

55.     City Council President Darrell L. Clarke stated, "This will be a wonderful program. … We're looking forward - I know I am - to the first groundbreaking as soon as possible."

56.     For its part, the City intended to fund Rebuild with proceeds from the Beverage Tax, the issuance of three (3) $100 million bonds, and contributions from the private sector.

57.     Therefore, the Kenney Administration's two signature initiatives - the Beverage Tax and Rebuild - were both interconnected and interdependent.  Rebuild could not proceed and/or succeed as envisioned unless the Beverage Tax was also implemented and/or generated the revenue necessary to support Rebuild's ambitious initiatives.

**William Penn Foundation**

58.     According to its website, "The William Penn Foundation, founded in 1945 by Otto and Phoebe Haas, is dedicated to improving the quality of life in the Greater Philadelphia region:

> Our mission is to help improve education for low-income children, ensure a sustainable environment, foster creative communities that enhance civic life and advance philanthropy in the Greater Philadelphia region.

59.     Since inception, the Foundation has made approximately 10,000 grants totaling more than $1.6 billion.  As of December 2017, the Foundation's assets totaled approximately $2.5 billion.[3]

60.     On or about November 21, 2016, William Penn announced its intention to commit up to $100 million to Rebuild, "Mayor Kenney's bold plan to transform city parks, libraries, recreation centers and playgrounds to enhance community life in neighborhoods across Philadelphia[.]"

61.     According to its announcement, "The Foundation's grant mark[ed] the initiative's largest private investment to date and the largest single grant in Foundation history."

62.     Janet Haas, Chair of the Foundation's Board of Directors stated, "Today's announcement underscores the William Penn Foundation's focus on generating new approaches for investing in under-resourced communities, for bringing communities together through the creative use of public space, and in providing opportunities for all of Philadelphia's citizens."

63.     According to Haas, Rebuild had the potential to serve as a national model for community reinvestment through the development and use of a data-driven investment strategy, intended to direct resources to where they would have the greatest impact.

64.     William Penn's commitment was structured as a "challenge" to assist the Kenney Administration in raising the full $500 million for Rebuild:  a) in July 2016, the Foundation approved an initial grant of $4.8 million to provide resources for start-up costs and initial implementation of the initiative; b) upon passage of a proposed $300 million city bond issue to

---

[3] William Penn Foundation is the philanthropic arm of The Haas Family.  Otto Haas was the co-founder of the Philadelphia-based specialty chemical company Rohm and Haas Company (R&H).  On July 10, 2008, nearly 100 years after it was founded, R&H announced that it was being acquired by the Dow Chemical Company.

fund Rebuild, the Foundation would make an additional $75 million available; and c) the remaining $20.2 million would be structured as a 1:2 match designed to generate additional contributions from state, federal, and other philanthropic and private sources.

65.     Mayor Kenney responded, "I am extremely grateful to the Foundation not only for this overwhelming vote of confidence in Rebuild, but also for all the insights and support they supplied along the way to get us here. This program would not be what it is without their expertise."

66.     The relationship with William Penn and the Haas Family was of paramount importance to the Kenney Administration.  In particular, while the Foundation had made (and continues to make) significant contributions to the City, as a public/private sector initiative Rebuild was especially dependent upon the funds being raised by William Penn - the $100 million commitment to Rebuild was larger than all previous grants by the Foundation to the City combined.

**The Beverage Tax Fails to Meet Projected Targets - Part 1**

67.     In or around June 2017, the City announced the initial results of the Beverage Tax.

68.     Although the Beverage Tax was expected to generate $7.7 million per month, City officials revealed it would generate significantly less revenue in fiscal year 2017 than originally anticipated.

69.     This placed tremendous pressure on the Kenney Administration which already had initiated programs based upon anticipated Beverage Tax revenues, including pre-K seats, and which led the Administration to look for alternative sources of funding for Rebuild to account for the Beverage Tax shortfall.

**The City's Renewed Enforcement Effort - Part 1**

70.     On or about June 15, 2017, Christopher W. Dean, Esquire, of the law firm Linebarger Goggan Blair & Sampson, LLP, outside counsel for the City, sent a letter via regular mail to plaintiff Silverberg advising that his law firm had been retained by the City to collect the June 3, 2008 judgment and demanded immediate payment, including accrued interest and penalties ("I&P").  Otherwise, according to the letter, a recommendation would be made to the City to direct the Sheriff to "levy or seize as much of your property [sic] to satisfy this obligation."

71.     From on or about June 15, 2017 to on or about September 29, 2017, numerous email exchanges occurred between attorney Dean and plaintiff Silverberg, secondary and related to Dean's initial letter to plaintiff, in which Dean demanded and/or sought to recover/collect the June 2008 judgment and to obtain documents and other information related thereto.

72.     The June 15, 2017 letter to plaintiff Silverberg was a shocking development since the City had abandoned the June 2008 judgment, and in fact, had taken no action to collect or enforce the judgment in the ensuing nine (9) years.

73.     While attorney Dean claimed the City was merely seeking to enforce its rights with respect to the June 2008 judgment, and unbeknownst to plaintiff, this was false and a

13

pretext for the true reason the City was contacting plaintiff and other similarly-situated taxpayers whose claims had been effectively abandoned and closed by the City.  Rather, the true reason was the Beverage Tax had generated less revenue than anticipated and/or insufficient revenue to support the programs/initiatives it funded, including Rebuild, and the City needed alternative sources of funding to account for the shortfall.

74.     Of paramount importance to the City was that any funding shortfall not imperil the City's ability to obtain the three (3) $100 million bonds, a favorable rate/rating in connection with the bonds, the City's ability to manage the debt service on the bonds, the City's ability to obtain the matching private sector funding associated with Rebuild, and/or any related matters that could imperil Rebuild and the City's initiatives/programs more generally.  Consistent with these concerns was Mayor Kenney's overarching concern for his "signature" initiatives (the Beverage Tax and Rebuild), keeping his promises to his constituents, and his relationships with public/private sector partners, including William Penn.

75.     William Penn had an equally important concern.  To the extent that Rebuild was at risk - either due to a lack of funding from the Beverage Tax, the conduct of the Kenney Administration, or for any other reason - the largest commitment in Foundation history also was at risk.

76.     William Penn's risks were especially high.  The Foundation had made its largest ever commitment to Rebuild, which by its very nature was an expression of confidence in Mayor Kenney and the City's administration of the program.  It would have represented a significant lack of due diligence and error in judgment on the part of William Penn if Rebuild failed because the City had not met its own funding commitments for the program.

77.     Therefore, despite nine (9) years of near-total inactivity, the City undertook an aggressive approach to recover the previously-abandoned June 2008 judgment at precisely the same time as the shortfall on Beverage Tax revenues was first reported.

78.     On or about July 16, 2017, plaintiff Silverberg filed a Motion for Judgment of Non Pros, or in the Alternative, to Enjoin Enforcement of the Judgment, in the Court of Common Pleas of Philadelphia County arguing the nine-year period of inactivity from 2008-2017 demonstrated a lack of due diligence on the part of the City in failing to proceed with reasonable promptitude.

79.     On or about August 23, 2017, the Court of Common Pleas issued an Order denying the motions.

80.      On or about October 24, 2017, in a related Opinion, the Court of Common Pleas determined the City's enforcement action was timely pursuant to the relevant limitations period.[4]

81.     On or about April 4, 2019, the Commonwealth Court adopted the trial court decision and affirmed.[5]

82.     Attorney Dean filed a Withdrawal of Appearance in or around May 2018.

83.     During attorney Dean's active participation, the City treated the June 2008 judgment as a collection matter only, and took no actions against any of plaintiff Silverberg's accounts.

---

[4] *See City of Philadelphia v. Richard J. Silverberg & Associates, et al.*, Philadelphia Court of Common Pleas, 2906 EDA 2017 (October 24, 2017).
[5] *See City of Philadelphia v. Richard J. Silverberg & Associates, et al.*, Commonwealth Court of Pennsylvania, No. 1783 CD 2017 (April 4, 2019).

**The Beverage Tax Fails to Meet Projected Targets - Part 2**

84.    In or around March 2018, the Kenney Administration lowered its revenue projections for the Beverage Tax and adjusted the size of the programs it funds.  The City now projected revenues of approximately $78.8 million for the current fiscal year, or about $13 million (or 15%) less than the City had anticipated.

85.    As a result, instead of expanding the free pre-K program to serve 6,500 children by fiscal year 2023 the City adjusted its estimate to a maximum of 5,500 seats, projected community schools were cut from 25 to 20, and overall spending for Rebuild also was reduced.

86.    Anthony Campisi, a spokesman for the Ax the Beverage Tax campaign, stated "The fact that the mayor overestimated revenue projections is going to have real impacts on Philadelphia families who have been promised an increase in pre-K seats and now some of those seats aren't going to materialize."

**Rebuild - Part 2**

87.    By May 2018, Rebuild still had not received funding or launched because the Beverage Tax was still being challenged in court.

88.    Despite the uncertainty of the Beverage Tax's fate, the Kenney Administration stated that Rebuild "need[ed] to start now."  According to Mayor Kenney:

> Philadelphians have been waiting for almost two years for Rebuild. During that time, my administration has worked with City Council and the building trades to develop a robust approach to diversity and inclusion with Rebuild, including two unprecedented commitments from the building trades to boost diversity within their ranks. Now that we have those commitments in place, it's

> time to start investing the money that's been sitting unspent while
> parks, recreation centers, and libraries are on the brink of closure.

89.    For Mayor Kenney and the Kenney Administration, the Beverage Tax and

Rebuild remained their highest political priorities.

**The City's Renewed Enforcement Effort - Part 2**

90.    On or about April 9, 2019, plaintiff Silverberg sent an email to Jane Istvan, Chief

Deputy City Solicitor, Appeals Unit, which stated in part:

> There is a separate, troubling issue that has been underlying this
> process from the beginning and which was touched upon in the
> submissions - the City's use of interest and penalties as a revenue-
> generating device.  While the purpose of I&P is to punish and deter
> (and make whole), the City is improperly utilizing I&P as a
> revenue-generating device.  In other words, by sitting on
> judgments for a period of years and then selectively enforcing
> them, the City is improperly utilizing the judgments (and the
> associated I&P) as the equivalent of a bond or other investment.
> So, rather than pursue judgments in a timely fashion, the City is
> intentionally allowing them to grow huge I&P components before
> seeking to recover on them.  There simply is no other reasonable
> explanation for allowing a judgment to sit for more than 10 years,
> or for an $80G judgment to become a $300G judgment before the
> City pursues it.  That is not merely punishing taxpayers; it is using
> and manipulating them for the City's own pecuniary purposes.
> That is bad faith.

91.    On or about April 9, 2019, defendant Diffily responded to plaintiff's email to

attorney Istvan, stating:

> The [Commonwealth Court] opinion supports the City's view that
> it not only can, but should, pursue collection of tax delinquencies,
> particularly where such monies finance important public initiatives

that benefit Philadelphia's citizens.[6]

92.    In fact, the specific purpose of the City's renewed collection effort was to account for the revenue shortfall from the Beverage Tax, which was intended to fund City initiatives including Rebuild, to protect the associated bond funding for Rebuild, to protect the associated public-private sector funding for Rebuild including the $100 million commitment from William Penn, and to protect the City/Administration's relationship with William Penn and the Haas Family more generally, which are significant supporters and/or contributors to the City/City Administration, and/or the programs/initiatives they sponsor and support.

93.    On or about April 10, 2019, attorney Diffily sent an email to plaintiff advising that Drew Salaman, Esquire of the law firm Salman/Henry was "taking the lead on collecting on the judgment."

94.    On April 17, 2019, attorney Salaman sent plaintiff a series of emails detailing the City's claims and position and stating that although total principal wage tax liability was $41,009.17, the City was presently seeking/demanding a total of $276,400.93, inclusive of fines, interest and penalties.  Attorney Salaman further stated to "kindly add 6% simple annual interest" from the date of entry of the June 2008 judgment through to the present.[7]

95.    On or about April 23, 2019, plaintiff sent an email to attorneys Salaman and Diffily and attached a draft of the original RICO Complaint, stating "Attached please find a draft of a Civil Action, which seeks both legal and injunctive relief in connection with the City's tax

---

[6] The Commonwealth Court adopted the trial court's decision and treatment of the issues, which focused on the limitations period, and did not address the City's "view."
[7] The 6% post-judgment interest rate charged by the City is approximately double both the prime rate and the average rate of return on municipal/corporate bonds for the past ten (10) years.

and collection policy and practices.  I expect the final version to be ready for filing either Thursday or Friday."[8]

96.     On or about April 29, 2019, plaintiff received an email and attached letter from Diana P. Cortes, Chair, Litigation Group, Law Department, City of Philadelphia, stating:

> I am in receipt of your email of April 23, 2019 directed to Kelly Diffily of the Law Department and Drew Salaman, counsel for the City, enclosing a draft Civil Action which you have threatened to file later this week against the City and various City officials and others. … [P]lease be advised that we regard your draft filing as baseless, frivolous, and unreasonable.  Should you continue with your plan to file such an action, the City will vigorously contest it and seek sanctions from the federal court.

97.     The City did not genuinely believe the draft Complaint was "baseless, frivolous, and unreasonable."  Rather, the true purpose or intent of defendant Cortes' letter was to, *inter alia*:  a) threaten, harass, intimidate and retaliate against plaintiff for the exercise of a federal right; b) dissuade plaintiff from taking any action which could or would implicate the City's taxing authority, policies and/or practices, and potentially jeopardize the Beverage Tax which already was subject to legal challenges and which the City viewed as vulnerable; c) dissuade plaintiff from taking any action which could or would implicate the City's programs and initiatives, including the funding for them; d) create a defense concerning the possible non-disclosure of plaintiff's allegations and claims against the City to stakeholders (including, *inter alia*, banks/bondholders since there is no disclosure requirement concerning *truly* frivolous claims; and e) protect Mayor Kenney and the Kenney Administration generally, including their political and/or personal agendas.

---

[8] On or about April 24, 2019, the following day, attorney Salaman withdrew his appearance from the state case.

98.     To knowingly characterize a legitimate claim(s) as frivolous for the specific

purpose of improperly avoiding disclosure and other obligations runs afoul of a lawyer's legal

and ethical obligations, and is itself a violation of the relevant standards.

**A Second Improper Utilization of Tax Collection/Enforcement Authority Emerges**

99.     From on or about May 10, 2019-present, Brian R. Cullin, Deputy City Solicitor,

engaged in a series of escalating enforcement actions including, *inter alia*:  a) serving written

discovery; b) filing motions; c) making a series of escalating settlement demands, including

demands that represented an approximately fourteen-fold increase from the amount that had been

discussed between attorney Dean and plaintiff Silverberg in June-September 2017, and which

included more than $170,000 in interest and penalties; d) contacting third parties concerning

plaintiff Silverberg; and e) issuing notices and subpoenas for depositions and documents.  All

filings/communications by defendant Cullin were either electronic, by U.S. mail, email, or

otherwise were via the mails and wires.

100.    On or about June 14, 2019, defendant Cullin sent plaintiff Silverberg an e-mail in

which he increased the City's demand from $175,000 to $185,000, thereby increasing the I&P

component of the demand to nearly $100,000.  Defendant Cullin stated:

> Please consider the City's updated offer to resolve the tax
> judgment against you:
>
> Lump sum payment of $185,000.00 to be made on or before
> August 1, 2019. This offer is on the table until 6/21/19 at 4 PM
> EST. After this time, the offer is withdrawn.
>
> City's offers will continue to escalate if you continue to ignore and
> refuse City's very reasonable efforts to resolve. City will also push
> forward in seeking out information relevant to your assets from

your close associates. To be clear, the City is in this for the long
haul, and we will investigate and exhaust any and all paths to
executing against your assets.

Look forward to hearing from you by 6/21/19 by 4 PM.

101.    The purpose and intent of each of defendant Cullin's actions was not the

legitimate collection/enforcement of the June 2008 judgment, resolution of a tax claim/case the

City previously had abandoned, or otherwise to recover funds the City claimed were due and

owing - any claim by defendant Cullin or the City to that effect is false and a pretext.  Rather,

defendant Cullin's various actions were a direct response to the April 23, 2019 e-mail to

attorneys Salaman and Diffily enclosing a draft of the original RICO Complaint (No. 19-2691)

and were carried out for the same reasons, or consistent with the reasons, defendant Cortes sent

the letter of April 29, 2019 to plaintiff Silverberg.

102.    Thus, while the intent of the original referral to defendant Dean was to attempt to

collect on the abandoned tax claims for purposes of making up for the shortfall on the Beverage

Tax, a second use or purpose for the June 2008 judgment emerged following plaintiff

Silverberg's notice to the City of plaintiff's intent to pursue the federal action, one far more

insidious and malicious:  as a device to harass, threaten, intimidate, and retaliate against plaintiff

Silverberg for the exercise of his federal rights, and to protect the Kenney Administration's

"signature" initiatives.


**The City's Renewed Enforcement Effort - Part 3**

103.    On or about June 20, 2019, plaintiff Silverberg filed a Civil Action.

104.     On or about August 13, 2019, plaintiff Silverberg filed a Motion for Preliminary Injunction to enjoin certain actions in by the City in connection with the state tax case.

105.     On or about August 13, 2019, plaintiff served the original RICO defendants with both the Complaint and Motion.[9]

106.     On or about August 15, 2019, only two (2) days after service of the original RICO Complaint and Motion and unbeknownst to plaintiff Silverberg, the City filed seven (7) Writs of Attachment concerning seven (7) banks in connection with the state tax case.

107.     Although plaintiff Silverberg is of record in the state case, he did not receive service of the Writs nor was there an electronic notification from the state court.  Plaintiff Silverberg only learned of the Writs based on an independent, unrelated inspection of the docket the following day.

108.     On or about August 29, 2019, defendant Cullin on behalf of the City levied funds from plaintiff Silverberg's bank and froze the account.  Plaintiff Silverberg received no prior notice, and therefore, no opportunity to defend prior to the funds being transacted and action being taken on the account.

109.     The City filed the Writs and levied plaintiff Silverberg's account not as part of a legitimate exercise of its authority to assess and collect taxes pursuant to the Philadelphia Code and/or proper enforcement of the June 2008 judgment, but rather as a direct response to the filing and service of the federal Complaint and Motion for Preliminary Injunction.  In particular, defendant Cullin's various actions were a direct response to August 13, 2019 service of the federal Complaint and Motion for Preliminary Injunction and were carried out for the same

---

[9] All defendants were served except defendant Dean.

reasons, or consistent with the reasons, defendant Cortes sent the letter of April 29, 2019 to plaintiff.

110.    As of August 15, 2019, the City had not filed Writs, or taken any enforcement action of any kind, since the September/October 2008.[10]

111.    The City has filed Writs of Attachment and sought to levy and/or levied plaintiff's accounts on two occasions in more than eleven (11) years:  a) in September/October 2008, shortly after the June 2008 judgment; and b) August 15, 2019, two (2) days after service of the federal Complaint and Motion for Preliminary Injunction to enjoin the City's unlawful actions.


**The Original RICO Case**

112.    On or about June 20, 2019, plaintiff Silverberg filed the original civil RICO/Section 1983 case.[11]  In short, the Amended Complaint challenged the City Defendants' conduct in connection with their improper utilization of the June 2008 judgment, first to prop-up the underperforming Beverage Tax, and second as a weapon against plaintiff Silverberg for the exercise of his federal rights and remedies (i.e., the "dual purposes" as described in the Amended Complaint and various other submissions).

113.    On or about January 8, 2020, the district court dismissed the Amended Complaint without prejudice based upon lack of subject matter jurisdiction, but determined the allegations were sufficient to state a claim for violation of Section 1983, stating "the City Defendants' tax

---

[10] In June 2013 and May 2018, the City filed a pro forma Suggestion of Non-Payment.
[11] Plaintiff filed an Amended Complaint on September 3, 2019.

collection activities violated Plaintiff's free speech and due process rights under the First and

Fourteenth Amendments, respectively."

114.    On or about February 4, 2020, plaintiff Silverberg filed a Notice of Appeal to the

United States Court of Appeals for the Third Circuit.

115.    The appeal is pending.


**The PUFTA Case - The City**

116.    On October 1, 2019, the City filed a separate lawsuit against plaintiffs alleging

that certain actions in connection with the December 2011 purchase of certain real property

located on Market Street in Philadelphia constituted a fraudulent conveyance within the meaning

of the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"), 12 Pa.C.S.A. §§ 5105-5110.[12]

In short, the City alleged the purchase of the Market Street property was an effort to avoid

payment of the June 2008 judgment in the matter of *City of Philadelphia v. Richard J. Silverberg*

*& Associates, et al.*, Philadelphia Court of Common Pleas, March Term 2008, No. 1510.

117.    As relief, the City sought equitable remedies and damages including, but not

limited to, $340,581.35 in damages,[13] an injunction against "further disposition" of the Market

Street property, an injunction against the disposition of all real property owned by plaintiff

---

[12] *See City of Philadelphia v. Richard J. Silverberg, et al*., Philadelphia Court of Common Pleas, Sept. Term 2019, No. 3805.
[13] In 2019, outside counsel for the City informed plaintiff Silverberg that while his outstanding principal wage tax liability in connection with the original tax case was approximately $40,000, the City was seeking more than $275,000.  Of the $340,000 the City claims is due and owing, approximately $260,000 is interest and penalties.

Silverberg and plaintiff ELS, and to levy and execute against the Market Street property, where plaintiff Silverberg currently resides.

118.     In an apparent effort to "pierce" the company's liability protections, the City falsely alleged that ELS is a single-member LLC even though the City did not possess (and never has possessed) any true information concerning the formation and/or structure of the company.

119.     Section 5109 of PUFTA, entitled "Extinguishment of cause of action," provides in pertinent part:

> A cause of action with respect to a fraudulent transfer or obligation under this chapter is *extinguished* unless action is brought:
>
> (1) under section 5104(a)(1)(relating to transfers fraudulent as to present and future creditors), within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant[.]

12 Pa.C.S.A. § 5109(1)(emphasis supplied).[14]

120.     The challenged transaction occurred on December 29, 2011.  Therefore, the City had four years, or until December 29, 2015, to file a claim.  Since the Complaint was filed on October 1, 2019, it is time-barred pursuant to first part of Section 5109.

121.     The Complaint also contains no facts demonstrating that the challenged transaction "was or could reasonably have been discovered" by the City within one year of the date of filing, and therefore is also time-barred pursuant to the second part of Section 5109.

122.     In fact, the procedural history is revealing of the true reason(s) the City filed the time-barred claim:  a) on or about June 20, 2019, plaintiff Silverberg filed the original RICO

---

[14] Section 5109 is not a statute of limitation but rather a statute of repose.

Complaint against the City/City Officials; b) on or about August 13, 2019, the City/City Officials

were served with the Complaint and a related Motion for Preliminary Injunction; c) on or about

September 3, 2019, the City filed a Motion to Dismiss the original RICO Complaint; d) on or

about September 3, 2019, plaintiff Silverberg filed an Amended Complaint which significantly

re-framed the allegations and claims against the original RICO defendants, and which now

included plaintiffs' allegations in connection with the improper funding of Rebuild; and e) on

October 1, 2019, nearly nine years after the challenged transaction but only 18 days after service

of the Amended Complaint, the City filed the PUFTA Complaint against plaintiffs.

     123.    Accordingly, the City did not just "happen upon" the challenged transaction.

Rather, after being served with the Amended Complaint in the original RICO case, the City -

intent on retaliation - went searching for a claim and stumbled upon the purchase of the Market

Street property.  Then, despite having no probable cause, no knowledge or information of a

fraud/fraudulent intent, or of a legal violation of any kind on the part of plaintiffs, and knowing

the claim was time-barred and therefore that officials were acting in bad faith, proceeded to file a

PUFTA claim anyway.  In short, the filing of the PUFTA Complaint was a blunt act of

retaliation and retribution against plaintiffs for plaintiff Silverberg's resistance to the City's tax

policies/practices and related lawsuit.

     124.    On January 14, 2020, in its Response to plaintiffs'/state court defendants' Motion

for Summary Judgment, signed and verified by defendant Cullin, the City stated:

> In September 2019, a close associate of Defendant Silverberg
> voluntarily provided previously unknown information to Plaintiff
> regarding the relationship between and among Defendant
> Silverberg, Defendant LLC, and the Market Street Property.  *Only
> as a result of this information* could Plaintiff have reasonably
> become aware of the scheme by Defendant Silverberg and
> Defendant LLC to privately transfer moneys from Defendant

Silverberg to Defendant LLC for the purposes of Defendant LLC
purchasing and subsequently holding the Market Street Property to
avoid execution by Plaintiff against the moneys or the real
property.

*Memorandum in Support of Response to Motion for Summary Judgment at 3* (emphasis
supplied).

125.     The above-referenced contentions by defendant Cullin, sworn under oath, are a
complete fabrication.[15]  In particular, but not by way of limitation:  a) no "close associate" of
plaintiff Silverberg voluntarily provided such information to the City in September 2019 or at
any other time; b) there was no "scheme" in connection with the funding of the transaction, and
therefore, the City could not have become "aware" of something that did not occur and/or never
existed; c) the City possessed no true information concerning the funding of the challenged
transaction; d) it is not possible to avoid, or have the intent to avoid, a judgment that has been
abandoned by the judgment holder; and e) the City was not engaged in a legitimate enforcement
action in the first instance, but rather a politically-motivated effort to raise funds for Rebuild as
the result of the revenue shortfall created by the underperforming Beverage Tax.

126.     The City's false claim that the City was provided with the information in
September 2019, shortly before the Complaint was filed, was for the specific purpose of
establishing the Complaint was timely pursuant to the second part of Section 5109.

127.     Accordingly, in an effort to demonstrate the PUFTA claim was meritorious and
timely and to defeat summary judgment, the City fabricated evidence concerning the supposed

---

[15] The City has never identified this mystery person, never provided an affidavit from him/her, or ever submitted any
evidence to support defendant Cullin's various contentions.  In fact, while the City claimed it was "only as a result
of this information" that the City supposedly became aware of the challenged transaction, this was the only time the
City ever made these specific arguments/claims.

discovery of the challenged transaction, submitted a sworn filing to the Court of Common Pleas advancing the fraud, and asked the Court to rely upon fraud, all for purposes of maintaining its illegitimate, bad faith, time-barred claim against plaintiffs.  Of course, the City's fabrication is an implicit acknowledgment that the City did not possess any evidence that would show the claim is timely.

128.    On August 31 and September 8, 2020, the City submitted Responses to Motions in the PUFTA matter which collectively provided a detailed explanation for why the City contended the PUFTA claim was not time-barred.  Importantly, whether wittingly or not, the Responses effectively admitted the City lacked probable cause to file the claim.

129.    On October 6, 2020, at a hearing on various Motions in the PUFTA case, plaintiff Silverberg argued that based upon the City's August 31 and September 8 Responses, and the explanations/admissions contained therein, the proceedings should be stayed pending disposition of plaintiffs'/state court defendants' Renewed Motion for Summary Judgment, and further, that it was implicit the City was not entitled to discovery.  The Court of Common Pleas (Roberts, J.) then asked defendant Cullin whether, in fact, the City previously had admitted that it lacked probable cause for the PUFTA claim.  Defendant Cullin denied the City ever made such an admission, thereby taking a position that was inconsistent with the August 31 and September 8 Responses.  Further, defendant Cullin's denial was for the specific purpose of obtaining Court-ordered sanctions against plaintiffs/state court defendants.  Judge Roberts, in reliance upon defendant Cullin's statements at the hearing as well as the City's fraudulent misrepresentations/ omissions in submissions more generally, granted the City's various Motions for Sanctions and issued a series of Orders which severely impaired plaintiff'/state court defendants' ability to defend themselves in the PUFTA matter, including an award of monetary sanctions.

130.     The decisions of the Court of Common Pleas, including the Orders of October 7, 2020, are consistent with and the result of the City's initial fraud upon the court (i.e., the filing of the Complaint).  While the City has asked the Court of Common Pleas for process and a remedy, the predicate for that request is a fraudulent claim.  Once infected by fraud, the proceedings are corrupted in their entirety, including any subsequent Court decisions.  Accordingly, each act by the City in furtherance of the PUFTA claim, including all Court filings, constitutes an abuse of process and violation (by counsel) of multiple provisions of the Code of Professional Conduct.

131.     Notably, with respect to both the August 31/September 8 Responses and the October 6 Hearing, the City/defendant Cullin did not argue that a "close associate" of plaintiff Silverberg had provided previously unknown information and/or that "[o]nly as a result of this information" could the City have learned of the challenged transaction.  Put another way, while the City has claimed to possess information demonstrating the PUFTA claim is timely, and that such information was the "only" information it ever had obtained which did so, the City failed to include it in its August 31/September 8 court filings or at the October 6 hearing.

132.     The City cannot have it both ways - either some unknown, unidentified, mystery "close associate" of plaintiff Silverberg provided the "only" information the City ever has relied upon to support the probable cause requirement for the PUFTA claim, or the City has *manufactured* a lawsuit, *fabricated* the basis for it, *fabricated* how it came to learn about the challenged transaction, and *fabricated* when it supposedly obtained the information.[16]

---

[16] In their Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment, plaintiff Silverberg stated, "Ironically, perhaps the best example that plaintiff has manufactured this entire dispute is that in a desperate effort to prevent dismissal, the City has created its own version of 'Deep Throat.' … Except Mark Felt was a real person." Plaintiff Silverberg further queried that, "It is unknown whether the claimed information was provided in an underground parking garage."

133.    The true purpose for filing the PUFTA claim was to retaliate against plaintiff Silverberg for his resistance to the City's improper and unlawful wage/business tax policies and practices, and the ensuing federal civil RICO/Section 1983 case challenging those same policies and practices.  *See Richard Silverberg v. City of Philadelphia, et al*., United States District Court for the Eastern District of Pennsylvania, No. 19-2691 (filed June 20, 2019), United States Court of Appeals for the Third Circuit, No. 20-1257.  Defendants have filed/pursued the PUFTA matter for the further purposes of protecting the City, William Penn, Mayor Kenney, the Kenney Administration, Rebuild, and the Beverage Tax, retaliating against plaintiffs, and as part of an effort to wrongfully obtain plaintiffs' property, possessions, and funds.

134.    The PUFTA case is an extension and continuation of the pattern of conduct that began in May 2019, and has been carried out by the same and/or similar persons/organizations for the same and/or similar reasons as the conduct described in the original civil RICO/Section 1983 case.

**The PUFTA Case - William Penn**

135.    According to its website, "The William Penn Foundation, founded in 1945 by Otto and Phoebe Haas, is dedicated to improving the quality of life in the Greater Philadelphia region."

136.    As a nonprofit, William Penn must be a steward not just of its mission, but also of its relationships.  For instance, a nonprofit cannot knowingly partner with and/or support organizations or individuals that engage in illegal activities, and must engage in due diligence to ensure that its activities and grants are consistent with both its mission and prevailing standards.

137.     The success of William Penn was and is inextricably intertwined with the success of the City of Philadelphia.  If the City succeeds by and through its programs/initiatives, then William Penn also succeeds to the extent it supports those same programs/initiatives.

138.     In November 2016, William Penn announced its intention to commit up to $100 million to Rebuild, "Mayor Kenney's bold plan to transform city parks, libraries, recreation centers and playgrounds to enhance community life in neighborhoods across Philadelphia[.]" The commitment was William Penn's largest private investment and largest single grant in Foundation history.

139.     While William Penn's commitment to Rebuild had great potential, there also were great risks.  Although James Kenney had been a member of City Council, he was a new Mayor in a new and unproven Administration.  Rebuild was a new and unproven political initiative which was being substantially funded by the Beverage Tax, another new and unproven political initiative.  Further, the administrators for both programs were unproven/untested because the programs themselves were unproven/untested.

140.     The Beverage Tax immediately became the subject of multiple court challenges, all of which were foreseeable, and which individually and collectively imperiled the funding for Rebuild.  Further, the Beverage Tax itself was controversial, and therefore, was itself a risk to the extent that if it survived the various legal challenges it remained unclear whether the public would support it.

141.     Despite these many uncertainties and risks, William Penn committed $100 million to Rebuild only 11 months into Mayor Kenney's first term.

142.    At least as early as July 2017, based upon various court filings, William Penn knew or should have known there were significant questions concerning the creation, administration, and/or funding in connection with Rebuild.

143.    Once plaintiff Silverberg challenged the legitimacy of Rebuild's funding, which was material, due diligence required William Penn to investigate and determine whether its original commitment should stand, be modified, and/or withdrawn.

144.    As time progressed and as plaintiff Silverberg's challenge intensified, which remained material, due diligence required William Penn to engage in an ongoing review and assessment of Rebuild and the City's administration of the program, and its commitment to the program, to ensure the program and any associated funding were proper and lawful.

145.    In June/September 2019, William Penn knew or should have known that plaintiff Silverberg filed a Complaint/Amended Complaint in federal district court alleging that the City had unlawfully re-allocated wage/business tax revenues to Rebuild to make up for the revenue shortfall from the Beverage Tax in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961(1), et seq.

146.    On or about January 8, 2020, William Penn knew or should have known that while the Amended Complaint was dismissed without prejudice based upon lack of subject matter jurisdiction, the district court had determined the allegations were sufficient to support the federal plaintiff's Section 1983 claims, stating "the City Defendants' tax collection activities violated Plaintiff's free speech and due process rights under the First and Fourteenth Amendments, respectively."

147.    Because the Amended Complaint was dismissed without prejudice, William Penn knew or should have known that following plaintiff Silverberg's appeal of the district court decision to the United States Court of Appeals for the Third Circuit, the case either would be returned to the district court or be transferred to state court for a determination on the merits.

148.    Accordingly, the same risks that existed prior to the January 8, 2020 decision continued to exist following the decision, and in fact, had increased based upon the district court's determination that claims had been stated for Constitutional violations.

149.    Any reasonable, rational reading of the pleadings, motions, and other submissions should have demonstrated to William Penn that there were significant questions concerning the legitimacy of Rebuild and/or the funding for the program, and which required an institutional response:  whether to acknowledge and mitigate the institutional, reputational, and other risks associated with the Foundation's initial decision-making process and decision to support Rebuild, or to stand by that same process and decision.  William Penn determined to stand by its original decision and has maintained its support for Rebuild.

150.    Upon information and belief, as a result of the Foundation's decision to maintain its commitment to and support of Rebuild, William Penn made the business and strategic decisions to continue to support the City's administration of the program, including its response to plaintiff Silverberg's challenge.  Further, since the City has responded to plaintiff Silverberg's challenge to Rebuild by filing the PUFTA Complaint, William Penn's support necessarily includes its support for the City's strategic decision to pursue the PUFTA claim.  Since plaintiff Silverberg has challenged the legitimacy of Rebuild, and since William Penn is a primary funder of Rebuild, it is apparent that William Penn is funding the City's response to plaintiff's challenge, including the City's pursuit of the PUFTA matter.

151.     Accordingly, upon information and belief, when plaintiff filed the initial RICO case challenging the funding for Rebuild and the City responded by filing the bad faith PUFTA Complaint, the City's actions were on behalf of both itself and William Penn.  Defendants William Penn and Haas have supported the PUFTA case to protect the Foundation's relationship with the City, Mayor Kenney, and the Kenney Administration, the $100 million commitment to Rebuild, their ongoing relationship with and support of the City/Administration's programs and initiatives, their respective reputations in the community, and as part of an effort to avoid any claim, investigation, negative publicity, and/or embarrassment concerning the Foundation's commitment to and/or lack of due diligence in connection with Rebuild.

**Institutions Fail When Led by Failed Leaders**

152.     This case and the original RICO case have shined a light on seismic institutional failures.

153.     The conduct being challenged has only occurred because those in leadership positions - persons with the legal, moral and institutional authority - either have engaged in wrongdoing or permitted it to occur.

154.     Wrongdoing has become so rampant and unethical behavior so normalized, that lawyers and those who supervise them are willing to engage in what once were considered unthinkable violations of the Code of Professional Responsibility.

155.    For legal and ethical standards to be meaningful, there must be meaningful consequences for those who violate them.[17]  Until then, it is apparent that defendants Kenney, Pratt, and others simply will continue to operate the City and its Law Department as criminal enterprises.

156.    For the City of Philadelphia and William Penn, and their leadership, there must be a reckoning.  While a court may determine whether there has been a legal violation, it is a sad day if that is the standard by which they determine how to conduct themselves as a representative government, philanthropic organization, and as corporate citizens.

## COUNT I
### PLAINTIFFS V. CITY OF PHILADELPHIA, JAMES KENNEY, TUMAR ALEXANDER, FRANK BRESLIN, MARCEL S. PRATT, ESQUIRE, DIANA P. CORTES, ESQUIRE, MARISSA O'CONNELL, ESQUIRE, BRIAN R. CULLIN, ESQUIRE, KELLY DIFFILY, ESQUIRE
### 42 U.S.C. § 1983 - VIOLATION OF CONSTITUTIONAL RIGHTS

157.    Plaintiffs incorporate, by reference thereto, Paragraph Nos. One (1) through One hundred fifty-six (156) as though fully set forth herein.

158.    The conduct of defendants, individually and/or through the municipal defendant's employees, representatives, and/or associates, acting at all times within the course and scope of their employment and in furtherance of the City's business and interests, constitutes conduct under color of state law within the meaning of Section 1983 and which has, *inter alia*:  a) violated plaintiffs' right to free speech as secured by the First Amendment; and b) subjected,

---

[17] Defendant Cullin's actions violate, *inter alia*, Pa.R.P.C. 3.3, 3.4, 4.1, 8.4, 8.4(c), 8.4(d), Preamble.  As supervising attorneys, the actions/omissions of defendants O'Connell and Pratt violate, *inter alia*, Pa.R.P.C. 5.1.  All remain actively licensed attorneys of the bar of the Commonwealth of Pennsylvania and employed by the City of Philadelphia Law Department.

resulted, or otherwise caused a loss or deprivation of plaintiffs' rights, privileges, and immunities and/or a deprivation of life, liberty, and/or property as secured by the Fourteenth Amendment to the Constitution and laws of the United States, all to plaintiffs' great detriment and loss.

159.    The allegations and claims set forth in the original and Amended RICO Complaints are an exercise of, and protected by, the freedom of speech and right to petition clauses of the First Amendment to the United States Constitution.  Further, a cause of action, and money, are forms of property.  The repeated interference with plaintiffs' exercise of their federal rights, and relatedly, repeated and resulting interference with and against plaintiffs' affairs, property, accounts and funds, constituted a loss or deprivation of plaintiff's rights, privileges, and immunities and/or a deprivation of life, liberty, and/or property as secured by the Fourteenth Amendment.  Specifically, but not by way of limitation:  a) on October 1, 2019, the City filed the time-barred, bad faith PUFTA Complaint; b) from on or about October 1, 2019-present, the City has engaged in numerous, repeated fraudulent misrepresentations/omissions in connection with court filings, mailings, emails, and/or other communications in furtherance of the PUFTA Complaint; c) although the challenged transaction occurred in 2011, the PUFTA Complaint was filed 18 days after the City Defendants were served (on or about September 3, 2019) with the Amended civil RICO/Section 1983 Complaint; d) as relief for the PUFTA Complaint, the City is seeking equitable remedies and damages including, but not limited to, $340,581.35 in damages, an injunction against "further disposition" of the Market Street property, an injunction against the disposition of all real property owned by plaintiff Silverberg and plaintiff ELS, and to levy and execute against the Market Street property, where plaintiff Silverberg currently resides; e) the PUFTA Complaint was not filed based upon probable cause, knowledge or information, and/or a legitimate belief that a violation of PUFTA had occurred, but rather to retaliate against

plaintiff Silverberg for his resistance to the City's improper and unlawful wage/business tax policies and practices, and the ensuing federal civil RICO/Section 1983 lawsuit and related Motion for Preliminary Injunction (served August 13, 2019, and as amended on September 3, 2019) challenging those same policies and practices; f) in January 2020, in an effort to defeat summary judgment in the PUFTA case, the City claimed that a "close associate" of plaintiff Silverberg provided critical information to the City and that "only as a result of this information" did the City supposedly become aware of the challenged transaction; g) in fact, the City's January 2020 claims, sworn by defendant Cullin, were a complete fabrication; h) on August 31 and September 8, 2020, the City submitted Responses to Motions in the PUFTA matter which collectively provided a detailed explanation for why the City contended the PUFTA claim was not time-barred and which, in effect, admitted the City lacked probable cause to file the claim; i) on October 6, 2020, defendant Cullin argued that the City had not admitted it lacked probable cause to file the Complaint, thereby taking a position that was contrary to the August 31/ September 8 filings; j) on or about October 7, 2020, in reliance upon the fraud/fraudulent misrepresentations/omissions by defendant Cullin at the hearing of October 6 and in the City's various submissions in the PUFTA case more generally, the Court of Common Pleas issued a series of Orders in favor of the City and against plaintiffs in the PUFTA matter which severely impaired their ability to defend themselves, including awards of monetary sanctions against both plaintiffs; and k) the Orders of October 7, 2020 substantially furthered the City's fraudulent, bad faith, time-barred claim, and substantially improved the City's chances of obtaining the relief sought in the PUFTA Complaint, including money damages and real property to which the City was not entitled.

160.    The true purpose for the Complaint was not that the City had probable cause, knowledge or information, and/or a legitimate belief that a violation of PUFTA had occurred, but rather to harass, intimidate, oppress and retaliate against plaintiffs for plaintiff Silverberg's resistance to the City's improper and unlawful wage/business tax policies and practices, and the ensuing federal civil RICO/Section 1983 lawsuit based upon violations of the First and Fourteenth Amendments challenging those same policies and practices.  Further, the City's actions were especially severe:  not only did the City file a bad faith, retaliatory lawsuit against plaintiffs, the PUFTA claim was specifically intended to threaten plaintiffs, including with the forfeiture of real property, and to coerce plaintiffs into abandoning their claims against the City Defendants.[18]  To that end, the City actually obtained rulings adverse to plaintiffs, including awards of monetary sanctions, and which significantly advanced the City's retaliatory lawsuit.

161.    The conduct described herein is an extension and continuation of the conduct described in the Amended Complaint in the matter of *Richard Silverberg v. City of Philadelphia, et al.*, United States District Court for the Eastern District of Pennsylvania, No. 19-2691 (originally filed June 20, 2019, amended September 3, 2019), which is incorporated by reference as though fully set forth at length herein.

162.    The City engages in a policy, practice, and/or custom of improperly utilizing the state and federal courts, and legal process, as a device to advance and protect the political, professional, and personal objectives and agendas of Mayor Kenney and the Kenney Administration.  In particular, but not by way of limitation:  a) the Amended Complaint in the original RICO case identifies at least 15 separate instances in which defendant Cullin violated

---

[18] The false allegation that ELS is a single-member LLC was a separate threat directed at plaintiff Silverberg since the allegation was intended to improperly "pierce" the company's liability protections.

the prevailing legal and/or ethical standards in the state tax case (March Term 2008, No. 1510); b) defendant Cullin's violations in the state tax case led to the wildly improper, illegitimate levy and freezing of plaintiff Silverberg's bank account and attempt to levy his individual retirement account ("IRA"); c) defendant Cullin's further violations in the state tax case, including the equally illegitimate effort to foreclose upon the Market Street property, led the Court of Common Pleas (Wright, J.) to grant a Motion for Protective Order and to Stay the Proceedings in March 2020, which remains in effect; d) defendant Cullin's various violations led the district court to determine, in the Memorandum and Order of January 8, 2020, that claims had been stated for violations of the First and Fourteenth Amendments; e) defendant Cullin filed the knowingly time-barred, bad faith PUFTA Complaint; f) defendant Cullin filed each successive document in the PUFTA case, each of which was filed for an improper purpose and in bad faith because the case itself was filed for an improper purpose and in bad faith; and g) defendant Cullin's fraudulent misrepresentations/omissions at the hearing of October 6, 2020, and in the City's various submissions more generally, led the Court of Common Pleas (Roberts, J.) to enter various Orders adverse to plaintiffs, which severely impaired their ability to defend themselves, including awards of monetary sanctions.  All of defendant Cullin's actions have been at the specific direction and/or with the approval of Marissa O'Connell, Divisional Deputy City Solicitor and/or Marcel S. Pratt, City Solicitor, City of Philadelphia.  Therefore, all such actions constitute the policy, practice, and/or custom of the City of Philadelphia.  Because attorneys O'Connell and Pratt are supervising attorneys within the meaning of Rule 5.1 of the Rules of Professional Conduct, both knew or should have known of defendant Cullin's conduct and violations at a time when its consequences could have been avoided or mitigated, but repeatedly failed to take reasonable remedial measures.

163.     The City defendants' actions were intended to and did interfere with and/or abridge the freedom of speech and right to petition clauses, and/or were an attempt to do so, in violation of the First Amendment.  Further, a lawsuit and the claims contained therein, are a form of property.  The City Defendants repeated interference with plaintiffs' federal rights, and relatedly, repeated interference with plaintiffs' affairs, property, accounts and funds, including the Court-awarded monetary sanctions, constitute a loss or deprivation of rights, privileges, and immunities and/or a deprivation of life, liberty, and/or property as secured by the Fourteenth Amendment, and/or were an attempt to do so.  In particular, a primary purpose and goal of defendants' actions was to interfere with, impair, undermine, frustrate, oppress, and otherwise so damage and harm plaintiff's ability to pursue his federal rights and remedies that that his ability to do so would be negatively impacted, he would be less able or unable to fund the litigation, forced to abandon the claims, or otherwise so prejudiced that his chances of prevailing would be severely diminished.

164.     Under the totality of the circumstances, the City's actions demonstrate the paramount importance of the Beverage Tax and Rebuild, Mayor Kenney's two (2) "signature" initiatives, the related importance of stakeholders, and the lengths City officials will go to ensure those initiatives are both implemented and succeed.  The City has been willing to place the interests of certain taxpayers over those of others, trample the Constitutional, federal statutory, and state rights of those same taxpayers, improperly utilize the state and federal courts in an illegitimate effort to advance and protect its interests, and have its lawyers engage in egregious ethical violations, all in service of political, professional and personal initiatives, objectives, and agendas, including those of Mayor Kenney and the Kenney Administration.

165.     As relief, plaintiffs demand all legal and equitable remedies for all injuries, harms, damages, and losses suffered as the result of defendants' unlawful conduct as described herein.  In particular, but not by way of limitation, plaintiffs demand, as appropriate, to be made whole, including but not limited to, an award of monetary damages/funds, interest on said money/funds, and any associated fines, penalties, attorney's fees, and costs.  As further relief for defendants' violations of plaintiffs' rights, plaintiff demands:  a) an award of compensatory damages for his severe personal injuries as described herein, including but not limited to, damage to and/or loss of personal and professional reputation, severe emotional distress and/or mental anguish with associated physical symptoms, humiliation, anxiety, and stress;[19] b) an award of punitive damages in that defendants' conduct was motivated by an evil motive or intent, and/or was in callous or reckless disregard to the rights of plaintiffs and others, and/or was intentional and/or reckless, wanton, extreme, and outrageous, and otherwise satisfied the standard of outrageousness necessary to support an award of punitive damages; c) an order enjoining defendants from ongoing violations and from engaging in similar or like conduct in the future; and d) all fines, penalties, attorney's fees, costs, and all other legal and equitable relief that may be available and that the Court deems just and appropriate.

WHEREFORE, plaintiffs, Richard J. Silverberg and ELS Realco LLC, demand judgment against defendants, City of Philadelphia, James Kenney, Tumar Alexander, Frank Breslin, Marcel S. Pratt, Esquire, Diana P. Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Kelly Diffily, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

---

[19] The demand for relief for emotional distress is limited to plaintiff Silverberg.

**COUNT II**
**PLAINTIFFS V. ALL DEFENDANTS**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**OBSTRUCTION OF JUSTICE - 18 U.S.C. §1951**

166.    Plaintiffs incorporate, by reference thereto, Paragraph Nos. One (1) through One

hundred sixty-five (165) as though fully set forth herein.

167.    The conduct of defendants, both individually and collectively, constitutes a

violation of plaintiffs' rights as secured by the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961 et seq., and in particular but not by way of limitation, 18 U.S.C.

§§ 1962(c), 1951.

168.    The conduct of the municipal and corporate/nonprofit defendants, each acting

through their employees, associates, and/or representatives, constitutes conduct of an enterprise

through a pattern of racketeering activity.  In particular, but not by way of limitation:  a) the City

and William Penn each constitute an association-in-fact or enterprise within the meaning of

RICO engaged in, or the activities of which affect, interstate or foreign commerce; b) in addition,

the City and William Penn formed a joint association-in-fact or enterprise within the meaning of

RICO; c) the activities of each enterprise and the joint enterprise were operated, managed, and/or

otherwise conducted by persons who were either employed by or associated with said

enterprise/joint enterprise within the meaning of RICO; d) in addition, the City and William

Penn each conducted their respective enterprises through the other, and therefore, were "persons"

within the meaning of RICO for purposes of doing so; and e) said persons conducted or

participated, directly or indirectly, in said enterprise's/joint enterprise's affairs through a pattern

of racketeering activity.  Defendants Haas, Kenney, Alexander, Breslin, Pratt, Cortes, and/or

O'Connell, created, authorized (and continue to authorize), manage, administer, endorse and/or condone the plan or scheme to use fraud, dishonesty, deceit, deception, abuse of process, unethical conduct, and other illegitimate means in the state and federal courts as a policy, practice, strategy, tactic, means and/or device to advance and protect, *inter alia*:  a) the City and William Penn; b) the related political, professional, and personal interests of Mayor Kenney/the Kenney Administration and those programs/initiatives that serve those interests, including Rebuild and the Beverage Tax; and c) the related political, social, philanthropic, and public relations interests and concerns of William Penn in connection with Mayor Kenney/the Kenney Administration and the related programs/initiatives, including Rebuild.  Said persons operate, manage, carry out and/or have management and/or supervisory responsibility for the persons who carry out the scheme, and are primarily responsible for the operation and/or management of the enterprise(s) through which it is carried out.  Defendants Diffily and Cullin were primarily responsible for, *inter alia*, certain obstructive conduct and mail/wire communications through which a significant part of the scheme was carried out, and had operation and/or management responsibility for the City enterprise within the meaning of RICO.  Each enterprise and joint enterprise comprise an ongoing organization with a framework for making and carrying out decisions, with members that function as a continuing unit with established duties, and which is separate, distinct, and apart from the pattern of racketeering activity in which it engages.

169.    Defendants obstructed, delayed, and/or affected commerce or the movement of an article or commodity in commerce by extortion, or attempted and/or conspired to do so. Defendants have endeavored and/or conspired to obtain property from another, with his consent, induced by wrongful use of actual or threatened force, fear, and/or under color of official right, in violation of 18 U.S.C. §§ 1951(a), (b).

170.    The City did not file the PUFTA claim based upon the existence of probable cause, facts, or a legitimate belief there had been a fraudulent transfer.  To the contrary, at the time the City filed its Complaint, the City had no knowledge or information of a fraud, fraudulent intent, or of a legal violation of any kind on the part of plaintiffs.  In fact, the City and its lawyers were certain they lacked probable cause to file a fraudulent transfer claim, certain the claim was time-barred, and certain they themselves were committing both a fraud upon the court and egregious ethical violations by filing the Complaint.

171.    Rather, a primary purpose and objective of the PUFTA Complaint was to obtain from plaintiffs, by the wrongful use of force, threat, and/or fear, certain funds, the Market Street property, other real property, and/or other property to which defendants have no lawful claim or entitlement.  Accordingly, defendants' actions as described herein, including those actions from October 1, 2019-present in connection with the prosecution of the PUFTA Complaint, constitute obstruction and/or an endeavor to do so, and/or conspiracy to obstruct justice, within the meaning of 18 U.S.C. §§ 1951(a), (b).

172.    The repeated obstructive acts of defendants, as hereinbefore set forth, were not isolated or sporadic events but rather were all related in that they had the same or similar purposes, participants, victims, results and/or methods of commission, and/or otherwise were related by distinguishing characteristics.  Additionally, the actions have continued over a substantial period of time and amount to, pose a threat of continuing racketeering activity, and/or are part of defendants' regular way of doing business, all of which has and will continue to have an adverse effect upon interstate commerce.  Further, as demonstrated by actions/omissions of defendants Cullin, O'Connell, and Pratt in the various cases, defendants engage in a pattern and practice taking unlawful and unethical actions in the state and federal courts for purposes of

advancing and protecting defendants' various interests and, upon information and belief, have

pursued, are currently pursuing, and/or have plans to pursue in the future additional

claims/judgments which are substantially similar to those described herein.

173.    As a direct and proximate result of defendants' pattern of racketeering activity as

described herein, plaintiffs have suffered an injury to business or property, and otherwise were

legally injured within the meaning of RICO.  In particular, but not by way of limitation, plaintiffs

have suffered the following damages and losses:  a) the loss and/or threatened loss of

possessions, property, and funds; b) actual/threatened loss and/or impairment to business

interests and concerns, including licensure and/or certification/registration; c) damage to and/or

loss of personal and professional reputation; and d) attorney's fees and costs and/or a substantial

increase in attorney's fees and costs, which were required and expended as a direct and/or

proximate result of defendants' racketeering activities.

174.    As relief for defendants' violations of plaintiff's rights as secured by RICO,

plaintiffs demand all legal, equitable, and/or other remedies available pursuant to RICO for all

damages, harms, injuries, and losses suffered, including all losses to business and/or property, for

the pattern of racketeering activity.  In particular, but not by way of limitation, plaintiffs demand:

a) an award of all economic and/or compensatory damages for the losses as hereinbefore set

forth; b) punitive, liquidated, and/or treble damages pursuant to 18 U.S.C. § 1964(c); c) an

injunction against further violations of plaintiffs' rights as secured by the Act; and d) fines,

penalties, attorney's fees, interest, costs, and all other legal and equitable relief that may be

available and that the Court deems just and appropriate.

WHEREFORE, plaintiffs, Richard J. Silverberg and ELS Realco LLC, demand judgment

against defendants, City of Philadelphia, William Penn Foundation, Janet Haas, M.D., James

Kenney, Tumar Alexander, Frank Breslin, Marcel S. Pratt, Esquire, Diana P. Cortes, Esquire,

Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Kelly Diffily, Esquire, jointly and/or

severally, in an amount in excess of $150,000, exclusive of interest and costs.

## COUNT III
## PLAINTIFFS V. ALL DEFENDANTS
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## <u>OBSTRUCTION OF JUSTICE - 18 U.S.C. §1512</u>

175.     Plaintiffs incorporate, by reference thereto, Paragraph Nos. One (1) through One

hundred seventy-four (174) as though fully set forth herein.

176.     The conduct of defendants, both individually and collectively, constitutes a

violation of plaintiffs' rights as secured by the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961 et seq., and in particular but not by way of limitation, 18 U.S.C.

§§ 1962(c), 1512(b)-(d).

177.     Defendants knowingly used intimidation, threats, or corruptly persuaded another

person, or attempted to do so, or engaged in misleading conduct toward another person, with

intent to:  a)  influence, delay, or prevent the testimony of a person in an official proceeding;

b) cause or induce a person to withhold testimony, or withhold a record, document, or other

object from an official proceeding; c) hinder, delay, or prevent the communication to a law

enforcement officer or judge of the United States of information relating to the commission or

possible commission of a Federal offense; d) corruptly obstructed, influenced, or impeded an

official proceeding, or attempted to do so; and/or e) intentionally harassed another person and

thereby hindered, delayed, prevented, or dissuaded a person from attending or testifying in an

official proceeding and/or reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense.

WHEREFORE, plaintiffs, Richard J. Silverberg and ELS Realco LLC, demand judgment against defendants, City of Philadelphia, William Penn Foundation, Janet Haas, M.D., James Kenney, Tumar Alexander, Frank Breslin, Marcel S. Pratt, Esquire, Diana P. Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Kelly Diffily, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

## COUNT IV
## PLAINTIFFS V. ALL DEFENDANTS
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## OBSTRUCTION OF JUSTICE - 18 U.S.C. §1503

178.     Plaintiffs incorporate, by reference thereto, Paragraph Nos. One (1) through One hundred seventy-seven (177) as though fully set forth herein.

179.     The conduct of defendants, both individually and collectively, constitutes a violation of plaintiffs' rights as secured by the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and in particular but not by way of limitation, 18 U.S.C. §§ 1962(c), 1503.

180.     Defendants corruptly, or by threats or force, or by threatening letter or communication, influenced, obstructed, or impeded, or endeavored to influence, obstruct, or impede, the due administration of justice.

WHEREFORE, plaintiffs, Richard J. Silverberg and ELS Realco LLC, demand judgment against defendants, City of Philadelphia, William Penn Foundation, Janet Haas, M.D., James

Kenney, Tumar Alexander, Frank Breslin, Marcel S. Pratt, Esquire, Diana P. Cortes, Esquire,

Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Kelly Diffily, Esquire, jointly and/or

severally, in an amount in excess of $150,000, exclusive of interest and costs.


### COUNT V
### PLAINTIFFS V. ALL DEFENDANTS
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### MAIL/WIRE FRAUD

181.    Plaintiffs incorporate, by reference thereto, Paragraph Nos. One (1) through One

hundred eighty (180) as though fully set forth herein.

182.    The conduct of defendants, both individually and collectively, constitutes a

violation of plaintiffs' rights as secured by the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961 et. seq., and in particular but not by way of limitation, 18

U.S.C. §§ 1341 and 1343 relating to mail and wire fraud.

183.    The fraudulent scheme or plan described herein was predicated upon, advanced,

carried out, furthered and/or concealed by defendants' use of the mails and wires in violation of

18 U.S.C. § 1341 (mail fraud) § 1343 (wire fraud), including "innocent" mail/wire

communications, in that there were numerous communications concerning and/or secondary to

defendants' racketeering activity.  In particular, from in or around October 2019-October 2020,

and for some time prior thereto, defendants and/or their representatives sent plaintiffs numerous

communications via electronic and/or regular mail, and electronically submitted and served upon

plaintiffs numerous court filings, concerning and/or in furtherance of their time-barred, bad faith

PUFTA claim and their illegitimate effort to obtain plaintiff's property, including the Market

Street property.  All communications from and to defendants and their attorneys described herein

or contemplated by the instant Civil Action, including all court filings, were transmitted via regular mail, email, and or electronically via the relevant electronic court filing system.

184.    The mails and wires were used and necessary to further the scheme to defraud, were detrimentally relied upon as part of the scheme, resulting in damage and loss.

WHEREFORE, plaintiffs, Richard J. Silverberg and ELS Realco LLC, demand judgment against defendants, City of Philadelphia, William Penn Foundation, Janet Haas, M.D., James Kenney, Tumar Alexander, Frank Breslin, Marcel S. Pratt, Esquire, Diana P. Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Kelly Diffily, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.


# COUNT VI
## PLAINTIFFS V. ALL DEFENDANTS
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT CONSPIRACY - 18 U.S.C. § 1962(d)

185.    Plaintiffs incorporate, by reference thereto, Paragraph Nos. One (1) through One hundred eighty-four (184) as though fully set forth herein.

186.    The conduct of defendants, both individually and collectively, constitutes a violation of plaintiffs' rights as secured by the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and in particular but not by way of limitation, 18 U.S.C. § 1962(d).

187.    The conduct of defendants constitutes an agreement or conspiracy to violate RICO within the meaning of 18 U.S.C. § 1962(d).  In particular, but not by way of limitation, defendants' various actions as described herein were in furtherance of a RICO conspiracy.

WHEREFORE, plaintiffs, Richard J. Silverberg and ELS Realco LLC, demand judgment against defendants, City of Philadelphia, William Penn Foundation, Janet Haas, M.D., James Kenney, Tumar Alexander, Frank Breslin, Marcel S. Pratt, Esquire, Diana P. Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Kelly Diffily, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

## COUNT VII
## PLAINTIFFS V. CITY OF PHILADELPHIA, JAMES KENNEY, TUMAR ALEXANDER, FRANK BRESLIN, MARCEL S. PRATT, ESQUIRE, DIANA P. CORTES, ESQUIRE, MARISSA O'CONNELL, ESQUIRE, BRIAN R. CULLIN, ESQUIRE, KELLY DIFFILY, ESQUIRE
## 42 U.S.C. § 1983 - RETALIATION

188.    Plaintiffs incorporate, by reference thereto, Paragraph Nos. One (1) through One hundred eighty-seven (187) as though fully set forth herein.

189.    The conduct of defendants, as hereinbefore set forth, individually and/or through the municipal defendant's employees, representatives, and/or associates, acting at all times within the course and scope of their employment and in furtherance of the City's business and interests, constitutes conduct under color of state law within the meaning of Section 1983 and which has, *inter alia*:  a) violated the freedom of speech and right to petition clauses of the First Amendment; and b) subjected, resulted, or otherwise caused a loss or deprivation of plaintiff's rights, privileges, and immunities and/or a deprivation of life, liberty, and/or property as secured by the Fourteenth Amendment to the Constitution and laws of the United States, all to plaintiffs' great detriment and loss.

190.     Plaintiffs engaged in a protected activity within the meaning of Section 1983 and the United States Constitution, the City defendants took a series of adverse actions against plaintiffs, and there is casual link between the protected activity and the adverse actions.

WHEREFORE, plaintiffs, Richard J. Silverberg and ELS Realco LLC, demand judgment against defendants, City of Philadelphia, James Kenney, Tumar Alexander, Frank Breslin, Marcel S. Pratt, Esquire, Diana P. Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Kelly Diffily, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

## COUNT VIII
## PLAINTIFFS V. ALL DEFENDANTS
## ABUSE OF PROCESS

191.     Plaintiffs incorporate, by reference thereto, Paragraph Nos. One (1) through One hundred ninety (190) as though fully set forth herein.

192.     The conduct of defendants as described herein constitutes an abuse or perversion of the legal process.  In particular, defendants did not file the PUFTA claim based upon the existence of probable cause, facts, or a legitimate belief there had been a fraudulent transfer.  To the contrary, at the time the City filed its Complaint, the City had no knowledge or information of a fraud, fraudulent intent, or of a legal violation of any kind on the part of plaintiffs.  Rather, the City and its lawyers were certain they lacked probable cause to file a fraudulent transfer claim, certain the claim was time-barred, and certain they themselves were committing both a fraud on the court and egregious ethical violations by filing the Complaint.

193.     The true purpose for filing the PUFTA claim was to retaliate against plaintiff Silverberg for his resistance to the City's improper and unlawful wage/business tax policies and practices, and the ensuing federal civil RICO case challenging those same policies and practices.

194.     While the City has asked the Court of Common Pleas for process and a remedy, the predicate for that request is a fraudulent claim.  Once infected by fraud, the proceedings are corrupted in their entirety, including any subsequent Court decisions.  Accordingly, each act by the City in furtherance of the PUFTA claim, including all Court filings, constitutes an abuse of process and violation (by counsel) of multiple provisions of the Code of Professional Conduct.

WHEREFORE, plaintiffs, Richard J. Silverberg and ELS Realco LLC, demand judgment against defendants, City of Philadelphia, William Penn Foundation, Janet Haas, M.D., James Kenney, Tumar Alexander, Frank Breslin, Marcel S. Pratt, Esquire, Diana P. Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Kelly Diffily, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

### COUNT IX
### PLAINTIFFS V. ALL DEFENDANTS
### <u>FRAUD</u>

195.     Plaintiffs incorporate, by reference thereto, Paragraph Nos. One (1) through One hundred ninety-four (194) as though fully set forth herein.

196.     Defendants, intentionally and/or knowingly, and/or in reckless disregard for the truth, made a series of false and/or fraudulent misrepresentations and/or omissions, which were material to the transaction at hand, which were justifiably relied upon by plaintiffs, and which resulted in damage or harm to plaintiffs.

WHEREFORE, plaintiffs, Richard J. Silverberg and ELS Realco LLC, demand judgment against defendants, City of Philadelphia, William Penn Foundation, Janet Haas, M.D., James Kenney, Tumar Alexander, Frank Breslin, Marcel S. Pratt, Esquire, Diana P. Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Kelly Diffily, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

### COUNT X
### PLAINTIFFS V. ALL DEFENDANTS
### NEGLIGENT MISREPRESENTATION

197.    Plaintiffs incorporate, by reference thereto, Paragraph Nos. One (1) through One hundred ninety-six (196) as though fully set forth herein.

198.    Defendants, intending to induce plaintiffs to act, misrepresented material facts, either knowing of the misrepresentations or without knowledge as to their truth or falsity, upon which plaintiffs justifiably relied, and which resulted in injury to plaintiffs.

WHEREFORE, plaintiffs, Richard J. Silverberg and ELS Realco LLC, demand judgment against defendants, City of Philadelphia, William Penn Foundation, Janet Haas, M.D., James Kenney, Tumar Alexander, Frank Breslin, Marcel S. Pratt, Esquire, Diana P. Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Kelly Diffily, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

## COUNT XI
## RICHARD J. SILVERBERG V. ALL DEFENDANTS
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

199.    Plaintiff Silverberg incorporates, by reference thereto, Paragraph Nos. One (1) through One hundred ninety-eight (198) as though fully set forth herein.

200.    The conduct of defendants was extreme and outrageous, intentional and/or reckless, and caused plaintiff Silverberg to suffer severe emotional distress with associated physical symptoms.

WHEREFORE, plaintiff, Richard J. Silverberg, demands judgment against defendants, City of Philadelphia, William Penn Foundation, Janet Haas, M.D., James Kenney, Tumar Alexander, Frank Breslin, Marcel S. Pratt, Esquire, Diana P. Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Kelly Diffily, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

## COUNT XII
## PLAINTIFFS V. ALL DEFENDANTS
## CIVIL CONSPIRACY

201.    Plaintiffs incorporate, by reference thereto, Paragraph Nos. One (1) through Two hundred (200) as though fully set forth herein.

202.    Defendants acted with a common purpose to do an unlawful act, or to do a lawful act by unlawful means or for an unlawful purpose, and committed an overt act in furtherance of the common purpose, all with an intent to injure plaintiffs and/or with malice, and which did injure plaintiffs.

WHEREFORE, plaintiffs, Richard J. Silverberg and ELS Realco LLC, demand judgment against defendants, City of Philadelphia, William Penn Foundation, Janet Haas, M.D., James Kenney, Tumar Alexander, Frank Breslin, Marcel S. Pratt, Esquire, Diana P. Cortes, Esquire, Marissa O'Connell, Esquire, Brian R. Cullin, Esquire, and Kelly Diffily, Esquire, jointly and/or severally, in an amount in excess of $150,000, exclusive of interest and costs.

### JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial concerning all claims which may be tried to a jury.

**RICHARD J. SILVERBERG**

BY: <u>Validation of Signature Code RJS1716</u>
    **RICHARD J. SILVERBERG**
    I.D. No. 48329
    P.O. Box 30433
    Philadelphia, PA 19103
    215-563-6369
    rjs@rjsilverberg.com
    Attorney for Plaintiffs